*FILED*

DEC 18 2012

U.S. DISTRICT
CLARKSBURG, WV 26301

**MICHELLE L. WILMOTH,**

   **Plaintiff,**

v.                                          **Civil Action No. 1:11CV129**
                                            **(The Honorable Irene M. Keeley)**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

   **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial

review of a final decision of the Commissioner of Social Security ("Defendant" and sometimes

"Commissioner") denying her claims for Supplemental Security Income ("SSI") and Disability

Insurance Benefits ("DIB") under Titles XVI and II, respectively, of the Social Security Act ("Act"),

42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on cross motions for summary

judgment and has been referred to the undersigned United States Magistrate Judge for submission

of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ.

P. 72(b); L.R. Civ. P. 9.02.

## I. Procedural History

Michelle L. Wilmoth ("Plaintiff") protectively filed applications for DIB and SSI on August

21, 2008, and September 2, 2008, respectively, alleging disability beginning July 16, 2007, due to

"problems" with the left side of her body, depression, carpal tunnel in her right arm, herniated disks,

pinched nerve in her neck, possible muscular dystrophy or multiple sclerosis, seizure disorder,

migraines, and anxiety (R. 184-96, 215, 249, 253). Plaintiff's applications were denied at the initial

and reconsideration levels (R. 120-23). Plaintiff requested a hearing, which Administrative Law

Judge Stephen R. Wood ( "ALJ"), held on May 18, 2010 (R. 42). Plaintiff, represented by counsel, and Vocational Expert Larry Ostrowski ("VE") testified (R. 46-117). On June 22, 2010, the ALJ entered a decision finding Plaintiff was not disabled through the date of the decision (R. 22-33). On June 24, 2011 the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 1-6).

## II. Statement of Facts

Plaintiff was thirty-seven (37) years old at the time of the hearing (R. 57). She obtained her GED and had past work as a personal care giver, housekeeper, cook, and census taker (R. 216, 220).

Plaintiff presented to the emergency department of Webster County Memorial Hospital on April 20, 2006, with complaints of back pain, stiff neck, and spasms due to a fall. Plaintiff was eight (8) months pregnant. She was medicated with Demerol and Phenergan (R. 535-39).

Dr. Greenburg conducted a consultative examination of Plaintiff on April 21, 2006. He noted Plaintiff was pregnant. She had fallen two days earlier and experienced "severe[,] unrelenting back pain that radiate[d] up into her neck[] and into her hips and right leg and she ha[d] been unable to walk." Plaintiff reported she had a history of migraine headaches and seizures "in the past." Plaintiff smoked one-half (½) pack of cigarettes per day. Dr. Greenburg's physical examination of Plaintiff produced normal results; however, Plaintiff was positive for pain with straight leg raising testing on the right (R. 354). Dr. Greenburg diagnosed "acute severe low back pain after a relatively minor fall at home. Symptoms are consistent with a herniated disk." Dr. Greenburg recommended that Plaintiff "try pain control" and "consider" medicating with prednisone and "other pain medications as needed to produce pain control" (R. 355).

Plaintiff underwent a Caesarean section on April 23, 2006, gave birth to a pre-term male, was

treated for chorioamnionitis, and was released from the hospital on April 24, 2006 (R. 352, 356-57).

Plaintiff's December 20, 2006, chest x-ray was normal (R. 607).

On July 14, and July 23, 2007, Plaintiff reported to the emergency department of Webster County Memorial Hospital with complaints of flu-like symptoms. She was prescribed doxycycline and Prednisone on July 14 and Cipro, Phenergan and Levaquin on July 23, 2007 (R. 529-34).

Plaintiff's July 23, 2007, chest x-ray was normal (R. 468).

On October 12, 2007, Plaintiff presented to Family Nurse Practitioner ("FNP") Curry[1] for left sided weakness, tingling, numbness, neck pain, and headaches. Plaintiff reported feelings of "heaviness" and being "clumsy"; she had difficulty with short-term memory. Plaintiff reported she had had seizures "several years ago." Upon examination, FNP Curry found Plaintiff's Rhomberg and Babinski were negative; she could tandem walk; her ranges of motion were intact; her deep tendon reflexes were diminished; her muscle tone was normal; she had "pronater drift" on the left. Plaintiff weighed one-hundred-ninety-three (193) pounds. FNP Curry diagnosed neck pain, headache, weakness, paresthesias, epilepsy, and tobacco abuse. She ordered a cervical spine x-ray and blood work (R. 445).

Plaintiff's October 15, 2007, cervical spine x-ray was normal (R. 467).

On October 19, 2007, Plaintiff presented to FNP Curry for headaches, weakness, fatigue, and neck pain. She reported she experienced left-side weakness, numbness, and tingling in her left lower and upper extremities. Plaintiff reported she had not experienced a seizure for "several years." Plaintiff's weight was one-hundred-ninety-six (196) pounds. She was diagnosed with neck pain, headache, weakness, paresthesias, epilepsy, tobacco abuse, and increased blood urea nitrogen

[1]FNP Curry's married name is now Meadows, which is reflected in later documents.

("BUN"). FNP Curry ordered an electromyography ("EMG"), brain MRI, and BUN/creatinine test. She suggested Plaintiff stop smoking (R. 444).

Plaintiff's November 18, 2007, MRI of her brain showed "nonspecific white matter lesions." It was noted that the "possibility of very early MS is a consideration" (R. 382, 386, 466, 793, 814).

On December 11, 2007, Plaintiff presented to FNP Curry for follow-up to her brain MRI. Plaintiff stated she was "doing well" on Lexapro; however, Medicaid would not pay for that medication and she requested a less expensive drug. Plaintiff reported she was doing "very well" on Chantix and was not smoking. FNP Curry noted Plaintiff's brain MRI showed lesions. She diagnosed depression. She referred Plaintiff to neurologist Dr. Shiv Nevada and prescribed Celexa and Chantix (R. 443).

Dr. Navada completed a neurologic consultation examination of Plaintiff on December 19, 2007, for weakness and abnormal cranial MRI. Plaintiff reported weakness, occasional tingling, and "some" numbness on her left side. Plaintiff stated her right shoulder ached. Plaintiff stated she had "impaired short term memory," which caused her to misplace things and forget people's names. Plaintiff stated she was "slightly lightheaded." Plaintiff retired between 10:00 p.m. and 1:00 a.m. and rose between 7:00 and 8:00 a.m. She snored and had "considerable daytime fatigue." Plaintiff had no sphincter or visual disturbances (R. 383). Except for finding that Plaintiff had been treated for depression, Dr. Navada's review of Plaintiff's systems produced normal results (R. 383-84). Plaintiff reported she smoked one pack of cigarettes and drank two (2) liters of Mellow Yellow per day. Plaintiff stated she medicated with Lexapro (R. 384).

Plaintiff was alert and oriented. Her recall was two (2) out of four (4) in a five (5) minute time frame. Plaintiff had "some trouble interpreting problems." She could not tell Dr. Navada

"much of recent news events but did not seem interested in the same." Plaintiff's cranial nerves were normal. She had full extraocular movements and visual fields, her facial sensation and strength were normal, and her hearing was normal. As to Plaintiff's motor strength, Dr. Navada found she "had some giveway (sic) weakness of hand grip." Plaintiff's sensation was intact; her reflexes were symmetric (R. 384). Her coordination was normal. She could walk on her toes and heels, tandem walk, and deep knee bend. Plaintiff's musculoskeletal examination was normal; her neck was supple; and her straight leg raising test was negative (R. 385).

Dr. Navada's impressions were as follows: non-specific white matter changes on Plaintiff's cranial MRI, which were "very small" and were four (4) or five (5) in number; fatigue; probable sleep apnea; obesity; impaired short-term memory; and smoker. Dr. Navada's plan was as follows: "[t]he possibility of multiple sclerosis has been raised in this young woman. Her symptoms[,] however[,] are not supportive of the same. She has not had symptoms such as optic neuritis, vertigo or bladder symptoms"; and "cranial MRI images were not very impressive." Dr. Navada recommended blood work to "look[] for treatable causes of memory impairment as well as fatigue," an overnight polysomnogram, and electroencephalogram ("EEG") (R. 385).

Plaintiff underwent an EEG on December 21, 2007; it was normal (R. 401).

Plaintiff presented to the emergency department of Webster County Memorial Hospital on December 30, 2007, with complaints of great right toe pain due to a fall. Her toe was red and swollen. The x-ray was negative (R. 511-16).

On January 1, 2008, Plaintiff presented to FNP Curry with complaints of great toe pain. She was diagnosed with great toe cellulitis. She was referred to Dr. Gutman, a neurologist, for neck pain (R. 442).

On January 11, 2008, Dr. Thomas Lauderman, a state-agency physician, completed a Physical Residual Functional Capacity ("RFC") Assessment of Plaintiff. Dr. Lauderman found Plaintiff could occasionally lift and/or carry fifty (50) pounds; frequently lift and/or carry twenty-five (25) pounds; stand and/or walk for a total of about six (6) hours in an eight (8) hour workday; sit for a total of about six (6) hours in an eight (8) hour workday; push/pull unlimited (R. 388). Plaintiff could frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; she could never climb ropes, ladders, and scaffolds (R. 389). She had no manipulative, visual or communicative limitations (R. 390-91). Plaintiff had no environmental limitations except exposure to hazards (R. 391).

On January 14, 2008, Plaintiff underwent a polysomnographic study. Dr. Navada found that Plaintiff's study was "normal" and "not supportive of obstructive sleep apnea syndrome or periodic limb movements of sleep." The study was "supportive of primary snoring" (R. 396-400).

Larry Legg, M.A., a licensed psychologist, completed a West Virginia Disability Determination Service Mental Status Examination of Plaintiff on February 8, 2008. Plaintiff was cooperative, suitably dressed, and serious. Her posture and gait were normal (R. 402). Plaintiff stated she did not remember "a lot" of her childhood; she finished school through the eleventh grade; she joined the Job Corps in 1991 and worked for one (1) year; earned her GED; and worked as a certified dietary aid. Plaintiff stated she was molested by her stepfather between the sixth and eighth grades. Plaintiff moved in with her grandmother. Plaintiff had never married; she and her current boyfriend had been in a relationship for eleven (11) years; he received Social Security disability benefits. Plaintiff informed Mr. Legg that she had not been diagnosed with muscular dystrophy or multiple sclerosis by a neurologist. Plaintiff had applied for Social Security benefits and listed her onset date as 2007 (R. 403). Plaintiff stated her "primary presenting problem [was] her medical condition." She stated her "'problems [were] with the left side,'" which felt as if it was "on muscle

relaxers." Her left shoulder "'hurt[] constantly'" (R. 403). Her hands tingled "all the time" (R. 403-04). She had had grand mal seizures since 1997; she only had them when she slept; she was prescribed anti-seizure medication in 1997; she never took the medication; her boyfriend said the seizures were becoming more frequent. Plaintiff had one (1) or two (2) migraine headaches monthly, which she treated with Darvocet, which "usually work[ed]." Plaintiff stated she was anxious. Plaintiff informed Mr. Legg that she "just stay[ed] on the go." She got "aggravated and anxious" because she had "too much on [her] plate." Plaintiff stated she medicated with Lexapro and Ativan "until recently." Medicaid would not pay for Lexapro, so she was prescribed Celexa, which "didn't work." Plaintiff stopped taking any medication for anxiety. Plaintiff had received counseling during her sixth, seventh and eighth grade years. Plaintiff stated she was depressed, was anxious, had an average appetite, had decreased energy, and had decreased sleep (R. 404).

Upon examination, Mr. Legg found the following: motivated, cooperative, polite attitude/behavior; normal speech; oriented times four (4); euthymic mood; broad affect; normal thought process and content; normal perception; fair insight; normal psychomotor behavior; normal judgment; normal immediate, recent, remote memories; normal concentration; normal persistence; mildly deficient pace; and normal social functioning. She had several friends and she ran errands, attended doctors' appointments, and shopped two (2) or three (3) times per week. "Her enjoyable activities [were] 'raising [her] son and taking care of [her] dogs.'" Plaintiff was not a member of any clubs, did not play sports, and was not a member of any church. Plaintiff's activities of daily living were as follows: she rose between 6:00 and 9:00 a.m., "whenever [her] son [woke] up." She prepared a bottle for her son, cared for their wood stove, drank soft drinks, let her dogs out, and spent the "rest of her day performing household chores and interacting with her son," which included

7

reading, bathing, and feeding him. Plaintiff retired between 10:00 p.m. and 1:00 a.m. (R. 406).

Mr. Legg's impressions were for adjustment disorder with mixed anxiety and depressed mood due to her "emotional symptoms in response to the psychological distress of her medical condition" which caused "marked distress and significant impairment in her social and occupational functioning." Mr. Legg found Plaintiff's prognosis was fair (R. 407).

Joseph A. Shaver, Ph.D., a state-agency psychologist, completed a Psychiatric Review Technique ("PRT") of Plaintiff on February 19, 2008. He found Plaintiff had affective disorder and anxiety-related disorder and that her impairments were not severe (R. 409). He found Plaintiff had mild limitations in her activities of daily living, maintaining social functioning, and maintaining concentration, persistence, and pace (R. 419).

Plaintiff had a cervical spine MRI completed on February 21, 2008. It showed "disk herniation in the left subarticular and neural foraminal zone on the left at C4-C5 causing severe impingement upon the existing C5 nerve on the left. There [was] facet arthropathy at this level with a likely small synovial cyst seen on the left. Some facet arthropathy at C5-C6 [was] seen. No other areas of central canal or neural foraminal stenosis [were] seen. The central cord signal intensity and morphology [were] unremarkable." The impression was for herniated disk in the left neural foraminal zone at C4-C5, which caused severe neural foraminal narrowing at the exiting left C5 nerve root (R. 424, 780).

Plaintiff presented to FNP Curry on February 29, 2008, for neck pain, bilateral lower extremity pain, and paresthesias. FNP Curry noted Plaintiff's recent MRI showed herniated cervical disks. Plaintiff complained of right great toe pain. Plaintiff's neck pain was seven (7) on a scale of one (1) to ten (10). Plaintiff's weight was two-hundred-six (206) pounds. FNP Curry diagnosed

great toe pain, herniated disk at C4-5, neck pain, cervical disk disease, and "H/O liver mass on MRI." FNP Curry prescribed Lortab and referred Plaintiff to physical therapy (R. 441).

Plaintiff's March 4, 2008, abdominal ultrasound was normal (R. 464).

Plaintiff presented to FNP Curry on March 14, 2008, for worsening and chronic neck pain, bilateral lower extremity pain, and paresthesias. Plaintiff stated Lortab did not relieve her pain. She had difficulty falling asleep. Upon examination, FNP Curry found Plaintiff's neck was tender to palpation down her cervical spine and her deep tendon reflexes were diminished. FNP Curry diagnosed chronic neck pain, herniated cervical disk, insomnia, and "H/O liver mass as per previous MRI." She instructed Plaintiff to continue physical therapy, practice good sleep hygiene, and consult a neurosurgeon. She also prescribed Ultracet, Lidoderm, Ambien, and Cymbalta, and ordered an abdominal MRI with contrast (R. 440).

Plaintiff's March 26, 2008, MRI of her liver was normal (R. 463).

On April 18, 2008, Plaintiff presented to FNP Curry for refill prescriptions for Lidoderm patches and Ultracet. Plaintiff's weight was two-hundred-eight (208) pounds; she was diagnosed with chronic neck pain and herniated disks (R. 439). Her lab results showed her glucose was elevated to one-hundred-fifty (150) (R. 447-48, 586).

Plaintiff presented to the emergency department of Webster County Memorial Hospital on April 25, 2008, with complaints of neck pain. Plaintiff stated her neck was swollen; she had a headache for a week; she had been participating in physical therapy. Plaintiff stated the Ultram and Darvocet did not help her pain. She was medicated with Demerol and Phenergan (R. 499-505).

Plaintiff presented to FNP Curry on May 23, 2008, for follow-up for chronic neck pain. Plaintiff stated her neck pain had worsened and was not "adequately alleviated with Ultracet or

Darvocet." Plaintiff's neck pain was three (3) on a scale of one (1) to ten (10). Plaintiff medicated with Cymbalta twice daily because it "'sticks' with her longer." Plaintiff had no other concerns. Plaintiff weighed two-hundred-seven (207) pounds. FNP Curry noted Plaintiff had a new diagnosis of type 2 diabetes; her blood sugar that day was two-hundred-fifteen (215). She discussed diet with Plaintiff. FNP Curry diagnosed chronic neck pain, herniated disks at C4-5, herniated lumbar disk, nicotine dependence, and diabetes. She instructed Plaintiff to stop smoking and lose weight (R. 438) She prescribed Cymbalta, Ulracet, Lortab, Lidoderm, Ambien, and Darvon (R. 431, 438).

On June 3, 2008, Plaintiff presented to FNP Curry for chronic low and mid back pain, which radiated to her left lower extremity with numbness, tingling and weakness. Plaintiff had attempted to treat her pain with Tylenol, Ultracet, Ultram, Lortab, physical therapy, and heat and ice, but with no relief. Plaintiff had a positive straight leg raising test; her patellon reflex was reduced. FNP Curry diagnosed chronic cervical pain of her mid and low back, left extremity radiculopathy, herniated lumbar disk, and diabetes. She prescribed Darvocet, Cymbalta, Ambien, Lidoderm, and hydrocodone (R. 431, 437).

Plaintiff had an x-ray of her lumbar and thoracic spine made on June 3, 2008. It showed "degenerative changes throughout the mid and lower thoracic region . . . [and] lumbar area" (R. 462).

Plaintiff presented to FNP Curry on June 13, 2008, for treatment of diabetes. FNP Curry found Plaintiff's blood sugar was "much better" and diagnosed type 2 diabetes, chronic neck, mid back and low back pain. Plaintiff was instructed to diet and medicate with Cymbalta, Ambien, Lidoderm, and hydrocodone (R. 431, 435).

On June 16, 2008, Plaintiff presented to the emergency department of the Webster County Memorial Hospital with a dog bite, headache, and neck pain. She reported she had a pinched nerve

in her neck. She was treated with Toradol. The dog bite was also treated (R. 481-87).

On June 17, 2008, Dr. Douglas, a neurologist, completed a New Patient Office Consultation form for Plaintiff, who had been referred by FNP Curry. Plaintiff complained of cervical pain and her "biggest complaint" was for "bilateral arm paresthesias"; she had no radicular complaints. She stated her symptoms began in January, 2007. Plaintiff reported she medicated with Darvocet, but nothing alleviated her symptoms and that walking and lifting "too much" worsened them. Plaintiff reported she had been "involved in physical therapy but no other type of current conservative management" (R. 554). Dr. Douglas noted Plaintiff had diabetes and she medicated with Darvocet and Cymbalta. Plaintiff smoked one (1) pack of cigarettes per day (R. 555). Dr. Douglas noted Plaintiff was in no acute distress. Upon examination, Plaintiff's straight leg raising test was negative at ninety (90) degrees bilaterally "with negative internal and external rotation of the femur." Plaintiff was oriented as to time, person, and place; her recent memory, remote memory, attention span, concentration, language, and fund of knowledge were normal. Plaintiff's motor strength was 5/5 in all major muscle groups in the upper and lower extremities, bilaterally. Dr. Douglas found no atrophy; her sensory was intact to pinprick in all major dermatones. Plaintiff's deep tendon reflexes were graded at 2+ and were symmetrical throughout both upper and lower extremities. Plaintiff had no clonus; her Hoffman and Babinski were negative (R. 556). Dr. Douglas noted Plaintiff's EEG was normal; he reviewed her cervical spine MRI and noted it showed some neural foraminal narrowing at C4-5 but showed "no significant nerve root compression." Dr. Douglas' diagnosis was cervical pain with bilateral arm paresthesias. He referred Plaintiff to Dr. Nevada for EMG and nerve conduction testing (R. 557).

On June 20, 2008, Plaintiff reported to FNP Curry that her neck pain was at level six (6). She

had no edema, clubbing, or joint swelling. Her pulses were +2 in the femoral and dorsalis pedis arteries. She was prescribed Levaquin, Flagyl, and Diflucan (R. 434, 606).

Plaintiff's June 22, 2008, thoracic spine MRI showed "intervertebral disc space narrowing with signal loss in the discs T6-7, T7-8, T8-9, T10-11, and T11-12. Endplate irregularity [was] seen. There [was] some discogenic edema within the endplates of T6-7. Disc herniations were seen at T6-7 and T7-8 in the right lateral recess. Effacement of the thecal sac [was] seen with encroachment upon the anterior cord. At T7-8, the disc extend[ed] more toward the midline. There [was] also a small disc herniation in the right paramedian region at T8-9." The impression was for multilevel disc herniations on the right from T6 through T9 (R. 425, 460).

Plaintiff's June 22, 2008, lumbar spine MRI showed "signal loss within the L3-4 disc with mild disc space narrowing with osteophytic change. . . . There [was] diffuse annular bulging at this level with bilateral foraminal encroachment. There appear[ed] to be facet joint hypertrophy in the lower lumbar spine particularly at L4-5 and L5-S1. At L5-S1, there [was] diffuse annular bulging and facet joint hypertrophy which encroach[ed] upon the right foramen more than the left." The impression was for degenerative disc disease (R. 461).

Plaintiff presented to FNP Curry on June 27, 2008, for review of her MRIs, refill of Ambien, and more samples of Cymbalta. She was continued on Lidoderm, Celexa, and hydrocodone. Plaintiff's mood was stable. FNP Curry diagnosed chronic neck and back pain; cervical, thoracic, and lumbar disc disease; insomnia; depression; and anxiety, and noted Plaintiff should schedule physical therapy and a follow-up appointment with Dr. Douglas. She referred her to a pain clinic. (R. 433).

Dr. Navada conducted a motor nerve study, sensory nerve study, and EMG of Plaintiff on

July 3, 2008, relative to her complaints of paresthesias and weakness of her arms (R. 541-42). He found the study was abnormal and "supportive of carpal tunnel syndrome bilaterally[.] The changes were moderate on the left and moderate to moderately severe on the right side" (R. 543).

Plaintiff presented to the Webster County Memorial Hospital emergency department on July 8, 2008, with complaints of headache, nausea, and vomiting. Plaintiff reported the headache was the same as past headaches. Darvocet did not relieve the pain. She was treated with Demerol, Toradol, and Phenergan, and was discharged to home (R. 469-80).

On August 13, 2008, Dr. Miele a neurologist, completed a consultative examination of Plaintiff. Her chief complaints were right arm numbness and thoracic and low back pain. Plaintiff stated her right hand became "intermittently" numb "throughout the day." It did not awaken her from sleep; she did not drop objects; and she did not feel "clumsy"; but she felt it "tire[d] easily." Dr. Miele considered the July 3, 2008, EMG, which supported a diagnosis of bilateral carpal tunnel syndrome. Plaintiff stated her back pain was "more of a nuisance and [was] relieved when her husband manipulate[d]/crack[ed] her back." Plaintiff stated she had no difficulty balancing or walking; she did not have pain that radiated to her legs. Plaintiff stated she had "not done much with respect to conservative therapy" (R. 544, 550, 559).

Dr. Miele noted Plaintiff had a history of depression; her cardiopulmonary, gastrointestinal, renal, and musculoskeletal systems were normal. Neurologically, Plaintiff had no syncope, dizziness, memory changes, disorientation, decreased hearing, double vision, or decreased visual acuity. Plaintiff stated she medicated with Cymbalta, Darvocet, and doxycycline. Plaintiff's weight was two-hundred (200) pounds and her height was five (5) feet, six (6) inches. She was in no acute distress. Upon examination, Dr. Miele found Plaintiff had no muscle atrophy; she had paraspinal

muscle tenderness in her thoracic and lumbar spine; her "posture show[ed] increased kyphosis in the mid thoracic area" (R. 545, 551, 560). Dr. Miele found Plaintiff was oriented as to time, person, and place. Plaintiff's recent memory, remote memory, attention span, concentration, language, and fund of knowledge were all normal. Her motor strength was 5/5 in all major muscle groups of the upper and lower extremities. Plaintiff's sensory was intact; she had a negative Tinel's test, but a positive Phalen's test on the right. Plaintiff's deep tendon reflexes were graded at 2+ and symmetrical throughout the upper and lower extremities. She had no clonus; her Hoffman and Babinski tests were negative (R. 546, 552, 561).

Dr. Miele reviewed Plaintiff's June 22, 2008, lumbar spine MRI, which "demonstrate[d] multi-level degenerative disc disease with associated facet hypertrophy[,]" which was "worse at L4 and L5." A "diffuse disc bulge" was shown as "worse on the right at L5-S1." Dr. Miele also reviewed Plaintiff's June 22, 2008, MRI of her thoracic spine, which "demonstrated degenerative disc disease at multiple levels as well as herniation at T6-7 and T7-8 encroaching minimally on the thecal sac" (R. 546, 552, 561).

Dr. Miele's findings and opinions as to bilateral carpal tunnel syndrome were as follows: conservative treatment would be "appropriate," prescribed palmar wrist splints and instructed Plaintiff to wear as needed, and ordered physical therapy. As to her thoracic and lumbar pain, Dr. Miele found Plaintiff had "significant degenerative disc disease for a person so young." He opined that no surgical options would be appropriate at that time but that lifestyle changes, such as ceasing smoking, losing weight, and strengthening core, would benefit her. She was given a program for core muscle strengthening; physical therapy was ordered (R. 547, 553, 562).

FNP Curry treated Plaintiff on August 22, 2008, for degenerative disc disease, diabetes,

14

depression, and anxiety. Plaintiff weighed two-hundred-two (202) pounds. She stated Darvocet was not effective in treating her pain. FNP Curry diagnosed cervical, thoracic and lumbar disc disease, depression, anxiety, diabetes, and obesity. She prescribed Percocet and Cymbalta. She instructed Plaintiff to diet and go to physical therapy (R. 432, 591).

FNP Curry referred Plaintiff to Dr. Fahim, a pain management doctor. He completed a consultative examination of Plaintiff on September 10, 2008. Plaintiff's chief complaint was for neck pain and mid and lower back pain. Plaintiff stated her neck pain started one (1) year earlier. She reported she had a "history of several motor vehicle accidents and several falls." Plaintiff stated her pain did not radiate to her upper or lower extremities, but she had left sided body weakness. She stated her pain was seven (7) to ten (10) on a scale of one (1) to ten (10). Plaintiff described her pain as shooting, stabbing, sharp, pulling, tingling, aching, penetrating, deep and continuous. Plaintiff's pain was increased by sitting, standing, walking, lifting, doing housework, coughing, lying flat on her back, and cold. Her pain was alleviated, "to some extent," with the use of medications. Plaintiff stated her pain was accompanied by nausea, visual disturbances, and left sided body weakness. Her pain interrupted her sleep. She reported she had undergone physical therapy for her neck in February, 2008, which "helped the pain," and she was getting authorized for another session of physical therapy. Plaintiff used a TENS unit during physical therapy, which "helped the pain." Plaintiff currently mediated with Percocet, Lidoderm, Cymbalta, and Ambien (R. 565). Plaintiff reported she had been in counseling and had been medicated for depression (R. 566).

In addition to pain and weakness, Plaintiff stated she experienced tiredness, weight gain, poor appetite, shortness of breath, occasional cough, nausea, occasional headaches, visual difficulty, depression and anxiety. Upon examination, Dr. Fahim found Plaintiff was alert and oriented, times

three (3); she could walk on toes and heels; and she had mild tenderness over the back of the neck but her pain did not increase when her neck was extended. Plaintiff had no thyromegly, clear lungs, soft and tender abdomen, no edema, steady gait, negative straight leg raising test on the right, positive straight leg raising test on the left at eighty (80) degrees, mild paravertebral muscular tenderness in her upper back and lower back, no sacroiliac joint tenderness, intact cranial nerves, intact and normal motor power in upper and lower extremities bilaterally, no weakness in her left side, intact and normal sensations in upper and lower extremities, and slightly diminished reflexes. Dr. Fahim found Plaintiff's "back pain improve[d] actually by extension" (R. 566).

Dr. Fahim reviewed Plaintiff's June 22, 2008, thoracic spine MRI, which showed "multilevel disc herniations on the right from T6 through T9"; and the June 22, 2008, MRI of the lumbar spine, which showed "facet joint hypertrophy in the lower lumbar spine particularly at L4-5 and L5-S1 . . . . [and an] annular bulge at L3-4 and L5-S1." Dr. Fahim reviewed Plaintiff's June 3, 2008 lumbosacral spine x-ray and noted it showed degenerative changes in the lumbar spine. Dr. Fahim did not review the MRI of Plaintiff's cervical spine but noted that, by reviewing the medical records, it showed "some disc herniation about C4-C5 and C5-C6 that herniates to the left side" (R. 566).

Dr. Fahim's impression was for multiple pain complaints, mid-back pain, neck pain, lower back pain, myofascial pain syndrome of the upper and lower back, multilevel disc herniation of the thoracic spine from T6 through T9, disc herniation at C4-5 and C5-6, degenerative disc disease of the lumbar spine with disc bulge at L3-4 and L5-S1, depression, occasional headache, and history of seizures. Dr. Fahim opined that Plaintiff "had improvement in the past with physical therapy for the neck and a Tens unit helped." He recommended she participate in physical therapy and use a home TENS unit. He prescribed Baclofen, 10mg, twice daily. He noted that if her pain did not

improve, he would "consider to start with thoracic epidural steroid injections" (R. 567).

Plaintiff reported to FNP Curry on September 12, 2008, that she was "doing much better" and her pain was "under much better control" with Percocet. She had no new complaints. Plaintiff was instructed to continue taking her prescribed medications (R. 590, 604).

Frank Roman, Ed.D., completed a Psychiatric Review Technique of Plaintiff on September 29, 2008. He found Plaintiff's impairments of affective and anxiety-related disorders were not severe (R. 571). He found Plaintiff had mild limitations in activities of daily living, social functioning, and concentration, persistence and pace (R. 581).

Plaintiff presented to FNP Curry on October 3, 2008, and requested refills of her medication for chronic neck and back pain. She voiced no new medical complaints or concerns. FNP Curry noted Plaintiff was ready to start her second course of physical therapy. Her mood was stable. She was prescribed Percocet and Ambian (R. 589, 603).

Plaintiff reported to FNP Curry on November 4, 2008, that she was pregnant and had stopped taking her medication five (5) days earlier. She had no morning sickness or breast tenderness. FNP Curry diagnosed pregnancy. She instructed Plaintiff to stop smoking, to not take any of her medications, to reduce caffeine, to take no over-the-counter medication, to see an obstetrician as soon as possible, and to begin taking prenatal vitamins (R. 588).

On December 12, 2008, James W. Bartee, Ph.D., reviewed "all the pertinent medical evidence in the file," and affirmed Dr. Roman's September 29, 2008, findings (R. 638).

Plaintiff's December 12, 2008, blood work showed elevated glucose (R. 700-01).

On January 2, 2009, Porfirio Pascasio, M.D., completed a Physical Residual Functional Capacity Assessment of Plaintiff. Dr. Pascasio found Plaintiff could occasionally lift and or carry

twenty (20) pounds; frequently lift and or carry ten (10) pounds; stand and/or walk for a total of about six (6) hours in an eight (8) hour work day; sit for a total of about six (6) hours in an eight (8) hour work day; and push/pull unlimited (R. 640). Dr. Pascasio found Plaintiff had occasional limitations in climbing ramps and stairs, balancing, stooping, knelling, crouching, and crawling; she should never climb ladders, ropes or scaffolds (R. 641). Dr. Pascasio found Plaintiff has no manipulative, visual or communicative limitations (R. 642-43). Dr. Pascasio found Plaintiff should avoid concentrated exposure to extreme cold and hazards, but her exposure to extreme heat, wetness, humidity, noise, vibration, fumes, odors, dusts, gases, and poor ventilation was unlimited (R. 643). Dr. Pascasio reviewed FNP Curry's October 3, 2008, medical notes (R. 646).

On March 11, 2009, Sharon J. Joseph, Ph.D., completed a Psychological Evaluation of Plaintiff, upon referral from Plaintiff's counsel regarding a disability determination. Plaintiff reported she lived with her boyfriend, had one child, and was pregnant. Plaintiff reported she quit school after the tenth grade and subsequently obtained her GED. Plaintiff stated her past work included working in a department store, working in a fast food restaurant, cooking at a resort, and working as a personal care provider (R. 650). Plaintiff reported she was being treated for "problems" with the left side of her body, back and neck pain, carpal tunnel syndrome, headaches, and seizures. Plaintiff stated that prior to becoming pregnant, she medicated with Percocet, Cymbalta, Ambien, and Baclofen. She smoked one-half (½) pack of cigarettes per day. Plaintiff reported that she had been molested by her stepfather when she was in the sixth grade, for which she had received counseling. Plaintiff stated she had been treated for depression by FNP Curry, who prescribed Cymbalta (R. 651). Dr. Joseph reviewed Plaintiff's records from Webster County Memorial Hospital, Webster County Memorial Hospital Clinic, Dr. Navada, Dr. Miele, Dr. Legg, Dr. Douglas,

and Dr. Fahim, and the results of objective medical tests (R. 651-52).

Plaintiff scored the following on the Weschler Adult Intelligence Scale - III ("WAIS-III"): Verbal IQ - 86; Performance IQ - 86; Full Scale IQ - 85, which was for "[l]ow [a]verage [r]ange of intellectual functioning." Plaintiff's scores on the Wide Range Achievement Test ("WRAT-3") were as follows: reading - high school; spelling - seventh grade; and arithmetic - seventh grade (R. 653). The testing was valid; Plaintiff put forth good effort (R. 653). Dr. Joseph's Mental Status Examination of Plaintiff produced the following results: Plaintiff was alert and oriented, times three; she was cooperative; her mood appeared to be depressed; Plaintiff denied suicidal and/or homicidal ideations; she had no hallucinations or delusions; Plaintiff had no preoccupations, obsessions or compulsion; her affect was appropriate; her motor activity was nervous; her posture was appropriate; Plaintiff's speaking was normal and content relevant; she had no psychomotor disturbances; her insight appeared adequate. Plaintiff's immediate memory, remote memory, concentration, and judgment were within normal limits; her recent memory was mildly impaired (R. 654).

Plaintiff reported the following activities of daily living: arose from bed between 6:00 and 7:00 a.m.; did "what she [could] around the house and for her son"; ate lunch; rested; cared for her son in the afternoon; made the bed; vacuumed; washed dishes, with breaks; cooked meals; put away groceries; went up and down steps slowly; shopped for groceries; drove; and managed her finances (R. 654). Plaintiff's socialization was found to be mildly impaired because she had one (1) friend, took her son outside to play, belonged to no groups, and watched television (R. 655).

Dr. Joseph's diagnosis was as follows: Axis I - major depressive disorder, recurrent, moderate; Axis II - no diagnosis; Axis III - medical problems; Axis IV - financial and vocational difficulties; and Axis V - GAF 55 (R. 655).

On April 3, 2009, Dr. Joseph completed a Mental Residual Functional Capacity Assessment of Work-Related Activities for Plaintiff. Dr. Joseph found Plaintiff was mildly limited in the following abilities: exercise judgment; make simple, work-related decisions; work in coordination with others without unduly distracting them; maintain acceptable standards of grooming and hygiene; maintain acceptable standards of courtesy; ask simple questions; request assistance from coworkers or supervisors; and carry out an ordinary work routine without special supervision. Dr. Joseph found Plaintiff was moderately limited in the following abilities: carry out, understand and remember short, simple instructions; carry out, understand and remember detailed instructions; sustain attention and concentration for extended periods of time; maintain regular attendance and punctuality; interact appropriately with the public; respond appropriately to direction and criticism from supervisors; work in coordination with others without being unduly distracted by them; relate predictably in social situations in the workplace without exhibiting behavioral extremes; demonstrate reliability; respond to changes in the work setting or work processes; be aware of normal hazards and take appropriate precautions; set realistic goals and make plans independently of others; travel independently in unfamiliar places; and tolerate ordinary work stress. Dr. Joseph found Plaintiff's ability to complete a normal work day and work week without interruptions from psychological symptoms and performing at a consistent pace without an unreasonable number and length of work breaks was markedly impaired (R. 557-61).

Also on April 3, 2009, Dr. Joseph completed a Psychiatric Review Technique of Plaintiff. She found Plaintiff had affective disorder (major depression, recurrent, moderate); anxiety-related disorder (anxiety disorder, NOS); and somatoform disorder (pain disorder with both physical and psychological components) (R. 662). Dr. Joseph found Plaintiff had moderate limitations in her

activities of daily living; social functioning; and concentration, persistence, and pace (R. 672).

On June 23, 2009, Plaintiff reported to FNP Curry that she was four (4) days postpartum; her pregnancy was uneventful; she had low and mid chronic back pain; she had no other complaints. Plaintiff requested that she be prescribed her previous medications. Her mood was stable. Plaintiff's weight was one-hundred-ninety-four (194) pounds. FNP Curry diagnosed cervical, thoracic, lumbar disc disease; osteoarthritis; depression; anxiety; impaired glucose tolerance; and obesity. She ordered blood tests, prescribed Percocet, Motrin, Cymbalta, and instructed Plaintiff to not breast feed, stop smoking, and diet (R. 699).

Plaintiff's July 15, 2009, blood work results showed elevated cholesterol and triglycerides; her glucose was normal. A note on the report read Plaintiff was prescribed Tricor. Plaintiff's thyroid stimulating hormone ("TSH") and alkaline phosphatase ("ALP") were elevated (R. 697-98).

On July 16, 2009, Plaintiff presented to FNP Curry with complaints of nausea and bilateral hip pain. Her mood was stable; she had no anxiety. Plaintiff's weight was one-hundred-eighty-eight (188) pounds. FNP Curry diagnosed abdominal pain, nausea, hip pain, "new dx hypothyroidism," depression, anxiety, increased ALP, and osteoarthritis. She prescribed Synthroid for elevated TSH; ordered hip x-rays; referred Plaintiff to physical therapy; instructed Plaintiff to maintain a low fat diet; and instructed Plaintiff to stop smoking (R. 696).

Plaintiff's abdominal July 27, 2009, ultrasound showed "hyperechoic mass-like area, right liver. Benign hemangioma would be favored. Pre- and post-contrast dynamic CT should be considered for more definitive assessment of liver parenchyma" (R. 694).

Plaintiff's July 27, 2009, x-rays of her hips were normal (R. 695).

On August 11, 2009, Plaintiff presented to FNP Curry with complaints of persistent nausea

and epigastric pain. Plaintiff was diagnosed with abnormal liver, nausea, epigastric pain, and hypothyroidism. Plaintiff's weighed one-hundred-seventy-eight (178) pounds. FNP Curry referred Plaintiff to Dr. Conley for an endoscopy and ordered a CT scan of Plaintiff's abdomen. She prescribed Phenergan (R. 693).

On August 27, 2009, Plaintiff was examined by Dr. Conley for GERD, dyspepsia and nausea. Plaintiff weighed one-hundred-seventy-six (176) pounds; her examination was normal. Dr. Conley assessed "abnormal ultrasound with questionable hemangioma and right, upper quadrant abdominal pain, and nausea." He ordered an esophagogastroduodenoscopy ("EGD"), hepatobiliary iminodiacetic acid ("HIDA") scan and CT scan (R. 711).

Plaintiff's September 2, 2009, HIDA scan showed "gallbladder consistent with chronic cholecystitis[2]" and "nonspecific hepatomegaly[3] without focal abnormality" (R. 678).

Plaintiff's September 4, 2009, non-contrast and contrast CT scan of her abdomen for "liver lesion; (sic) possible hemangioma" showed no focal abnormality; her spleen, pancreas, "adrenals," and kidneys were normal; and "mild hepatomegaly" and nodules on the right lung (R. 677).

On September 10, 2009, Plaintiff was treated by FNP Curry for nausea and intermittent right, upper quadrant abdominal pain. Plaintiff complained of elevated anxiety and depressed mood. FNP Curry noted Plaintiff was three (3) months postpartum and had been taking Cymbalta for six (6) to eight (8) weeks. Plaintiff weighed one-hundred-seventy-five (175) pounds. FNP Curry diagnosed chronic cholecystitis, abdominal pain, nausea, pulmonary nodules, osteoarthritis, postpartum

---

[2]Cholecystitis: inflammation of the gallbladder. *Dorland's Illustrated Medical Dictionary*, 32nd Ed., 2012, at 348.

[3]Hepatomegaly: enlargement of the liver. *Dorland's Illustrated Medical Dictionary*, 32nd Ed., 2012, at 846.

depression, and anxiety. She referred Plaintiff to a surgeon, continued her prescription for Cymbalta, and prescribed Vistaril (R. 691).

Plaintiff's September 15, 2009, CT scan of her lungs was normal except for two (2) small nodules in the right lung. It was recommended that Plaintiff follow-up in six (6) months (R. 676).

On September 17, 2009, Plaintiff presented to Dr. Short with complaints of stomach pain, nausea and vomiting. Plaintiff stated she could not "keep anything down." Dr. Short noted Plaintiff's ultrasound was normal and her HIDA scan was "essentially unremarkable," but the "gallbladder lit up after the small bowl . . . but during the injection of CCK the patient had absolutely no abdominal pain or discomfort or nausea and was totally asymptomatic." Plaintiff stated she had "eaten pizza and hamburgers and other foods with no complaint." Plaintiff's systems were normal (R. 679). His examination of Plaintiff's neck was normal (R. 679). Plaintiff's abdomen was tender; however, there was no hepatosplenomegaly[4] and her bowel sounds were normal. Plaintiff's extremities were intact and all had free ranges of motion. Dr. Short found Plaintiff's symptoms were not compatible with gallbladder disease (R. 680).

Plaintiff presented to FNP Curry on September 24, 2009, for her three (3) month postpartum examination. Plaintiff reported she was not sleeping at night. She stated she had "taken Vistaril during day only" and had "tremendous [reduction] in anxiety level." Plaintiff had no new complaints or concerns. Her mood was stable. Plaintiff weighed was one-hundred-seventy-seven (177) pounds. Her blood pressure was 148/93. FNP Curry diagnosed elevated blood pressure, tobacco abuse, chronic cholecistitis, abnormal chest CT scan, pulmonary nodules, postpartum depression, insomnia,

---

[4]Hepatosplenomegaly: enlargement of the liver and spleen. *Dorland's Illustrated Medical Dictionary*, 32nd Ed., 2012, at 847.

abnormal blood work results, osteoarthritis, and chronic back pain. FNP instructed Plaintiff to check her blood pressure at home and report the results during her next visit, discontinue smoking, reduce caffeine intake, and keep her follow-up appointments with Dr. Conley and Dr. Short (R. 689). FNP Curry prescribed Vistaril, oxycodone, ibuprofen, Cymbalta, baclofen, and Synthroid (R. 689-90).

Dr. Conley's October 13, 2009, upper endoscopy of Plaintiff showed prepyloric ulcers (R. 713). His October 22, 2009, examination of Plaintiff relative to her upper endoscopy showed she was "doing much better on Kapidex," and it relieved all of her pre-pyloric ulcer symptom (R. 710).

On November 16, 2009, Plaintiff participated in outpatient mental health therapy with Karen Dotson, a licensed professional counselor. Plaintiff stated she was "trying to take some time for" herself, such as bathing, sitting and watching television, or taking walks. Plaintiff stated she cried "all the time" and had "some severe depression." Plaintiff stated she was "being the mediator between [her] brothers (sic) wife and [her] own mother." Plaintiff stated she experienced chronic pain. She attempted "to do [her] house work," but she had to "stop and sit down." Plaintiff stated she had no energy, did not sleep well, and had "very poor concentration." Ms. Dotson found Plaintiff had good eye contact; her affect was sad; her mood was "okay"; her concentration was poor; her memory, judgment and insight were intact; her grooming and hygiene had improved in that she had "her first shower in two weeks"; she was alert and goal directed; her cognition was intact. Ms. Dotson found Plaintiff's sociability was restricted because she did "not go[] out or socalize[]." Ms. Dotson found that Plaintiff needed someone to care for her children for a "couple hours per week" so Plaintiff could "go to the store, take a shower, go to lunch, just something to get out of the house." Ms. Dotson found Plaintiff was making progress (R. 778).

On November 18, 2009, Lois Urick, M.D., completed a Psychiatric Evaluation of Plaintiff.

Plaintiff reported she had experienced depression since she had been a child. Plaintiff reported increased depression since the birth of her second child five (5) months earlier. She described her symptoms as follows: depressed mood, limited interest in activities, poor self esteem, feeling agitated, being fatigued, poor concentration, feelings of hopelessness, poor appetite with weight loss, and insomnia (R. 705). Plaintiff stated she medicated with Percocet, Kapidex, Synthroid, ibuprofen, and Baclofen "in addition to psychotropics" (R. 706). She had been sexually abused by her stepfather; lived with her boyfriend; had two sons, aged three (3) years, six (6) months old and four (4) months old. She had "not worked in some time and [was] a stay-at-home mother" (R. 706).

Dr. Urick found Plaintiff was alert and oriented, times four (4). She had good eye contact; no psychomotor abnormalities; appropriate manners; "generally euthymic" affect; mood that she described as "'not too bad'"; normal speech; goal-directed thought; no delusions; intact attention, concentration, and impulse control; clear sensorium; intact cognition; good judgment; partial insight; and "grossly intact" recent and remote memories. Dr. Urick diagnosed major depressive disorder, recurrent and moderate, and anxiety disorder, NOS (R. 706). Dr. Urick found Plaintiff's prognosis was fair. She prescribed Prozac, Cymbalta, and Vistaril and recommended counseling (R. 707).

Plaintiff's December 4, 2009, blood work showed normal TSH and elevated ALP (R. 753).

On December 7, 2009, Plaintiff presented to FNP Meadows (née Curry); her only complaint was "night sweats." FNP Meadows' examination of Plaintiff's skin, eyes, neck, heart, lungs and abdomen were normal. Her extremity pulses were +2 bilaterally; her blood pressure was 146/92. FNP Meadows diagnosed hypertension, abnormal CT scan of chest, right lung nodule, depression, anxiety, dyslipidemia, osteoarthritis, chronic low back pain, increased ALP, and night sweats. FNP Meadows prescribed Prinivil. Plaintiff continued to medicate with Baclofen, oxycodone, ibuprofen,

Cymbalta, Synthroid, Vistaril, Ambien. FNP Meadows instructed Plaintiff to follow a low-sodium diet and stop smoking; ordered a chest CT scan; ordered blood work; and instructed Plaintiff to return in four (4) to six (6) weeks (R. 749, 752-51).

Plaintiff presented to Dr. Urick on December 9, 2009, for medication management. Plaintiff stated she thought Prozac was "definitely starting to help." She was "better able to handle stress." She stated "things [did] not bother her quite as much." Plaintiff's examination was normal. Dr. Urick diagnosed major depressive and anxiety disorders, NOS, "both with some initial response to low dose Prozac" and continued Plaintiff's prescriptions for Prozac, Cymbalta, and Vistaril (R. 718).

On December 15, 2009, Plaintiff participated in therapy with Ms. Dotson. Plaintiff stated she had no help with her children. She said Prozac was "working fairly well" and she felt "some differences" in her mood and ability to manage depression. She stated her partner was a "controller." Ms. Dotson found Plaintiff's sociability was restricted by her having "two small children and no help and [did] not like to take them out in crowds." Plaintiff was making progress (R. 776).

Plaintiff presented to Dr. Urick on January 6, 2010, relative to medication management. Plaintiff stated she was "not doing as well as she was." She stated she was "ready to give up." Plaintiff reported she did what she needed to do to care for her sons but did not feel "like doing much of anything." Plaintiff stated her husband was "always 'bitching' at her and saying everything [was] her fault, and she [said] she [was] tired of trying to please anybody except for her children." Plaintiff stated Vistaril was "somewhat helpful" and Prozac "did help some." Plaintiff's examination was normal. Plaintiff described her mood as "'not all that good.'" Her affect was dysphoric. Dr. Urick diagnosed major depressive and anxiety disorders, NOS, with ongoing moderate symptoms. Dr. Urick prescribed Prozac, Cymbalta, and Vistaril (R. 717).

Plaintiff participated in therapy on January 6, 2010, with Ms. Dotson. Plaintiff stated she did "okay" over Christmas holiday and had been at home since the holidays due to inclement weather. She did not receive any Christmas gifts from her partner and he acted as though he cared nothing for her and cared only for the children. Her depression was "decreasing some" due to medication and deep breathing. Plaintiff stated her depression had worsened during the past two weeks, she had no energy, and she cried. Ms. Dotson noted Plaintiff was "much better . . . in her ability to recognize thought[s] that trigger . . . negative feelings." Ms. Dotson found Plaintiff's sociability was "restricted by no money and by partner not allowing [Plaintiff] to go many places in the vehicle" (R. 774).

On January 18, 2010, Plaintiff presented to FNP Meadows with complaints of acute exacerbation of her low back pain. Plaintiff stated her mood was depressed, but stable. Plaintiff had no other concerns or complaints. Upon examination, FNP Meadows found Plaintiff had mid-back tenderness; her pulses in her extremities were graded at +2; her reflexes were +2, bilaterally; her cranial nerves were intact; her strengths and grips were equal, bilaterally; her back was tender to palpation from T6 to L5; she had no SI joint tenderness; she had no costovertebral angle tenderness; and her straight leg raising test was positive on the left. FNP Meadows diagnosed acute exacerbation of chronic low back pain, mid back pain, hypertension, abnormal CT scan of the chest, right lung nodule, depression, anxiety, dyslipidemia, elevated alkaline phosphatase, and osteoarthritis. FNP Meadows ordered an x-ray of Plaintiff's lumbar and thoracic spines; instructed Plaintiff to have a follow-up CT scan of her chest; instructed Plaintiff to have lab work completed; referred Plaintiff to physical therapy; and refilled Plaintiff's prescription for Ambien and Percocet. Plaintiff's prescriptions for Baclofen, oxycodone, ibuprofen, Cymbalta, and Synthroid were continued (R. 746-48, 749).

Plaintiff's January 19, 2010, thoracic spine x-ray and lumbar spine x-ray showed "multilevel degenerative disc change with no acute fracture or subluxation" (R. 740).

On January 21, 2010, Plaintiff participated in therapy with Karen Dotson. Plaintiff reported that Prozac helped her "stay focused" and to not have "so many crying spells"; she was concentrating "better." Plaintiff reported she was getting more sleep because her partner "actually listened for the kids the (sic) night." Ms. Dotson noted Plaintiff's socialization had not improved because Plaintiff "only [went] to her appointments for she (sic) and her kids and [went] one time a week to the grocery store, stay[ed] home and [was] a house wife (sic) and mom" (772).

Plaintiff's January 26, 2010, chest CT scan showed "stable right lower lobe nodule compared to the study of 09/15/09. Previously noted right middle lobe nodule not well defined in the current study and appears to be due to a confluence of vascular markings. Thoracic spondylosis. Prominent bilateral axillary lymph nodes. No other significant findings" (R. 712, 739).

On February 11, 2010, Plaintiff participated in therapy with Ms. Dotson. She reported she was able to control her temper. Plaintiff stated she could "tell [her] medications [were] working for the most part." She was "sometimes happier and even Daniel notice[d] the change." She had fewer crying spells and was not as depressed. Ms. Dotson noted Plaintiff was making progress and found Plaintiff's sociability was restricted because she had no baby sitter and got "no respite from her children." She was making progress in elevating her mood and decreasing her depression (R. 770).

On February 15, 2010, Plaintiff presented to FNP Meadows with complaints of "hacking" cough since taking Prinivil; it was different from her "usual smoker's cough." She had no other complaints or concerns. Upon examination, FNP Meadows found Plaintiff's lungs had decreased breath sounds, bilaterally, but had no wheezes, rales or rhonchi. FNP Meadows diagnosed cough,

chronic back pain, hypertension, hyperlipidemia, osteoarthritis, depression, anxiety, tobacco abuse, and hyperkalemia. FNP Meadows instructed Plaintiff to schedule physical therapy; instructed her to discontinue Prinivil; prescribed Maxzide, Zocor, and Percocet; ordered lab work and chest x-rays; and instructed Plaintiff to follow a low fat, low cholesterol diet with increased whole grains. Plaintiff continued medicating with Baclofen, oxycodone, ibuprofen, Synthroid, and Ambien (R. 737, 749).

On February 23, 2010, Plaintiff consulted with Dr. Urick relative to medication management. Plaintiff stated she thought the higher dosage of Prozac was "helping a little bit better, but [said] she ha[d] been upset in the past several days because it [was] the first anniversary of having had to put her dog to sleep." She had been "taking extra Prozac" and thought that "overall . . . Prozac ha[d] been partially helpful." Plaintiff's examination was normal. She described her mood as "'not all that great.'" Her affect was anxious and tearful "because she [was] sad about her dog." Dr. Urick diagnosed major depressive disorder and anxiety disorder, NOS, "with some mild ongoing symptoms" and prescribed Prozac, Vistaril, and Cymbalta (R. 716).

On March 11, 2010, Plaintiff participated in therapy with Karen Dotson. Plaintiff reported she was not "doing well" because of "issues with finances, . . . poor health, not getting enough rest, relationship issues, no help." Plaintiff stated her "trigger" was chronic pain. Plaintiff stated that when her back and legs hurt, she had a "shorter concentration time." Plaintiff stated she knew she had to do "this for [her] sons (sic) but it [was] very difficult for [her] some days" (R. 768).

On March 17, 2010, Plaintiff presented to FNP Meadows with complaints of sore throat, cold, and congestion (R. 733-35). FNP Meadows noted Plaintiff was tolerating Maxzide and Zocor well. Plaintiff stated she had experienced heartburn, which was rare and relieved by over-the-counter Zantac. Plaintiff's mood was stable; she had no other complaints or concerns. Plaintiff's blood

pressure was 110/70; her weight was two-hundred-six (206) pounds. FNP Meadows diagnosed upper respiratory infection, acute rhinosinusitis, GERD, tobacco abuse, chronic back pain, depression, and anxiety. She instructed Plaintiff to continue medicating with Zantac, gave Plaintiff Nicoderm patches for tobacco cessation, and prescribed an antibiotic and Percocet. Plaintiff continued medicating with Baclofen, oxycodone, ibuprofen, Synthroid and Maxzide (R. 733-35, 749).

On March 22, 2010, Plaintiff participated in therapy with Karen Dotson. She reported she had been sleeping better. Plaintiff attributed her sleeping difficulty, in part, to the mattress, which exacerbated her chronic pain and arm and hand numbness. Plaintiff stated she was "feeling some better." Plaintiff stated the techniques she learned at therapy "helped to decrease her depression and crying spells and . . . ." Ms. Dotson found Plaintiff's sociability was "restricted by not having a baby sitter [and] not getting out," which caused Plaintiff to "get[] very depressed and feel[] isolated from her peers . . . ." Her anxiety was "increased . . . over her inability to provide any financial support and worry[] about her finances and her children (sic) finances . . . ." She reported she was attempting to "get her disability from her back injury." Plaintiff was making "progress" (R. 766-67).

On March 31, 2010, Plaintiff consulted with Dr. Urick relative to medication management. Plaintiff stated she was doing "'okay, I guess.'" She reported "some milder ongoing symptoms of depression"; her depression was "quite mild at this time." Plaintiff stated she did not "feel the Cymbalta [had] really been helpful and [said] she did not really notice improvement since she started the Prozac." Dr. Urick's examination of Plaintiff produced normal results. Plaintiff described her mood as "'okay.'" Dr. Urick diagnosed major depressive disorder, anxiety disorder NOS, "with ongoing milder symptoms." Dr. Urick prescribed Prozac, Vistaril, and Cymbalta (R. 715).

On April 5, 2010, Plaintiff participated in therapy with Karen Dotson. Plaintiff reported the

following: "I am doing some better today. I have reduced some of my depression by being outside in the nice weather with the kids and doing my relaxation techniques and thought replacement strategies to keep myself positive and not to let the depression get to me." Plaintiff reported she had had a "good Easter," because there was "no fighting and fussing with my family or Daniel." Plaintiff reported she was "doing better and [felt] better" because she medicated with Prozac; she stated she could "tell a big difference in" herself. Her affect and mood were "much brighter today." Plaintiff stated she "love[d] being a mom." Plaintiff stated she had "some restriction picking up her sons due to her bad back." Ms. Dotson found Plaintiff was "more motivated to make changes in her behaviors to decrease her bouts of depression/anxiety" and was very responsive to treatment strategies (R. 764).

On April 14, 2010, Plaintiff presented to FNP Meadows with complaints of "some intermittent headaches and dizziness." FNP Meadows noted Plaintiff's description of the symptoms were "very vague." Plaintiff reported "associated feeling of what she consider[ed] to be involuntary movements." Her legs and arms moved without her knowing; she reported twitching in her muscles; she stated she experienced tremors. Plaintiff stated she thought she "may have Parkinson's disease." Plaintiff stated she was "doing well" on Prozac. Upon examination, Plaintiff was alert and oriented as to person, time and place. Her blood pressure was 140/80; she weighed two-hundred-eight (208) pounds. FNP Meadows' examination of Plaintiff's eyes, neck, lungs, heart, and abdomen produced normal results. Plaintiff's extremities had no edema or swelling; her pulses were measured at +2, bilaterally. FNP Meadows noted no tremor; Plaintiff's cranial nerves were intact and "without obvious deficit." Plaintiff's biceps reflexes were +2 bilaterally; her strength and grips were equal, bilaterally. FNP Meadows diagnosed headaches and dizziness and ordered a MRI of Plaintiff's brain. Plaintiff continued medicating with oxycodone, ibuprofen, Cymbalta, Synthroid, Vistaril,

Ambien, Prozac, Maxzide, and Zocor (R. 730-31, 749).

On April 19, 2010, Plaintiff participated in therapy with Karen Dotson. Plaintiff reported she had "decreased [her] depression by using what [she] learned in session to assert [herself] . . . ." Plaintiff reported she had many stressors, "like no money for [her] sons (sic) birthday cake" and having to borrow money to have a small party for her child. Plaintiff stated her pain level had gotten worse, which caused her to "constantly feel[] awful," and she was not sleeping well. Plaintiff stated Prozac was "helping" alleviate her depression symptoms. She stated she "love[d] being a mom." Plaintiff's affect and mood were intact. Ms. Dotson found Plaintiff's "sociability [was] very restricted" because she had no "money to go places and ha[d] no baby sitter and stay[ed] home unless she ha[d] and (sic) appointment or [went] to the grocery store." Ms. Dotson found there was a "slight improvement" in Plaintiff's depression symptoms due to Prozac (R. 762).

On May 3, 2010, Plaintiff had therapy with Karen Dotson. Plaintiff reported she had tried not to cry "as often"; "worked on reframing . . . negative thoughts"; and done "relaxation techniques before bedtime." She stated her arms and hands and chronic back pain "set off [her] feelings of agitation and irritation." She stated she needed more sleep, but she had two (2) young children who needed her. She had "financial issues and some family problems." Plaintiff's medication helped her "most days." Ms. Dotson found Plaintiff's sociability was restricted by having no money, "somatic complaints, worries about her children, her relationship and where she might end up"(R. 760).

On May 6, 2010, Plaintiff presented to FNP Meadows with complaints of chronic daily headaches with occasional photophobia and phonophobia, involuntary muscle movements when awake and asleep, daytime drowsiness, excessive fatigue, chronic paresthesias in all extremities, and some dizziness. Upon examination FNP Meadows found Plaintiff was alert and oriented as to

person, time, and place. Her blood pressure was 117/75; she weighed two-hundred-ten (210) pounds. Examinations of Plaintiff's eyes, ears, neck, heart, lungs, and respiratory system were normal. Plaintiff's extremities had no edema; her pulses were +2. Plaintiff's neurologic examination showed normal reflexes, cranial nerves were intact, and strength and grips were equal, bilaterally. FNP Meadows noted no tremor. FNP Meadows diagnosed Plaintiff with chronic daily headaches, history of seizure disorder, involuntary muscle movement, excessive daytime drowsiness, and chronic fatigue and ordered an EEG, sleep study and brain MRI. Plaintiff continued medicating with Baclofen, oxycodone, ibuprofen, Synthroid, Vistaril, Ambien, Prinivil, and Zocor (R. 728-29, 749).

On May 8, 2010, FNP Meadows completed a Primary Care Physician Questionnaire of Plaintiff. FNP Meadows noted she had treated Plaintiff since July, 2007. She listed the following as Plaintiff's relevant past medical history: chronic back pain, headaches, GERD, hypertension, depression, anxiety, hyperlipidemia, osteoarthritis, hypothyroidism, impaired glucose intolerance, insomnia, seizure disorder, and chronic fatigue. FNP Meadows stated Plaintiff's "most recent chief concern is that of chronic headaches [with] associated dizziness and what she [Plaintiff] refer[red] to as involuntary muscle spasms and movements" (R. 719). FNP Meadows listed the following findings, laboratory tests and other data to support Plaintiff's symptoms: depression and anxiety - "seeing psychiatrist"; migraine headaches - "attempting to schedule MRI brain"; herniated discs, pinched nerve in back, and "left side of body [did] not function correctly" - "has had MRI"; elevated blood pressure – "treated [with] antihypertesive (sic) medications"; chronic cholecystitis - "had HIDA scan"; pulmonary nodules - "per CT chest"; chronic rhinosinusitis - "based on clinical exam . . ."; hypothyroidism - "based upon TSH"; cervical, thoracic and lumbar disc disease - "has had xrays (sic); impaired glucose tolerance - "based upon gluco & HgAIC"; and epilepsy - "per

33

[Plaintiff] + [headaches] currently scheduling EEG" (R. 720). FNP Meadows found Plaintiff's impairments and symptoms were consistent with her clinical findings (R. 721).

FNP Meadows found Plaintiff was capable of sedentary activity. She had to alternate positions frequently because sitting in one (1) position for too long caused back pain. FNP Meadows found Plaintiff required a sit/stand option and had to vary positions every one (1) hour. FNP Meadows found Plaintiff could sit for one (1) hour at a time, stand for fifteen (15) minutes at a time, and walk for ten (10) minutes at a time. Plaintiff could "be up on her feet" for a total of one (1) hour during an eight (8) hour work day. Plaintiff could sit for a total of four (4) hours in an eight (8) hour workday. Plaintiff would not need to lie down during a work day; however, she would require rest periods, as needed, during a day (R. 722-23). FNP Meadows found Plaintiff could never climb, balance, or crawl, but she could infrequently stoop, bend, kneel, crouch, stretch, reach, and squat (R. 723). FNP Meadows found Plaintiff should avoid concentrated exposure to excessive humidity and hot or cold temperatures; should avoid even moderate exposure to fumes, dust, noise, and environmental hazards; and should avoid all exposure to machinery, jarring or vibrations. FNP Meadows found Plaintiff would experience chronic moderate pain and severe intermittent pain. Plaintiff needed no assistive devices to ambulate (R. 724). FNP Meadows found Plaintiff did not need to elevate her feet but could not use her feet or legs for repetitive movements due to "lower extremity weakness & parasthesias (sic) associated [with] chronic back pain & disc disease." FNP Meadows found Plaintiff could not use her hands for repetitive motions due to carpal tunnel syndrome (R. 725). Based upon medical signs, FNP Meadows found Plaintiff's right hand had loss of grip strength and numbness. FNP Meadows found Plaintiff could not sit upright for prolonged periods of time at a desk with her head in a forward flexed position because of carpal tunnel

34

syndrome. FNP Meadows found Plaintiff's impairments would cause her to be absent from her job twice a month. FNP Meadows found Plaintiff did not have any degree of "'functional overlay'" such as a mental impairment that, in combination with her listed impairments, resulted in a greater disability (R. 726). FNP Meadows found Plaintiff was not capable of performing a full-time job and had been incapable of working full-time since July, 2007, due to chronic fatigue, back pain and depression (R. 727).

On May 11, 2010, Ms. Dotson completed a Mental Residual Functional Capacity Assessment of Work-Related Abilities on Plaintiff. Ms. Dotson found Plaintiff had no limitations in her ability to understand, remember and carry out instructions; maintain regular attendance and punctuality; interact appropriately with the public; and maintain acceptable standards of courtesy and behavior. Ms. Dotson found Plaintiff had mild limitations in her ability to sustain attention and concentration for extended periods; maintain acceptable standards of grooming and hygiene; relate predictably in social situations in the workplace without exhibiting behavioral extremes; demonstrate reliability; ask simple questions or request assistance from coworkers or supervisors; respond to changes in the work setting or process; be aware of normal hazards and take appropriate precautions; carry out an ordinary work routine without special supervision; and set realistic goals and make plans independent of others. Ms. Dotson found Plaintiff had moderate limitations in her ability to complete a normal workday and work week without interruptions from psychological symptoms; perform at a consistence pace without an unreasonable number and length of work breaks; respond appropriately to direction and criticism from supervisors; work in coordination with others without being unduly distracted by them; travel independently in unfamiliar places; and work in coordination with others without unduly distracting them. Ms. Dotson found Plaintiff had a marked limitation

in her ability to tolerate ordinary work stress. Ms. Dotson found Plaintiff's limitations extended from July, 2007, to the date of the report (R. 754-59).

Plaintiff's May 24, 2010, an EEG was "abnormal due to paroxysmal[5] generalized slowing noted on several occasions throughout the recording. This is a non-specific abnormality that may be seen with generalized encephalopathy's of many causes. It is to be noted that non-specific changes may sometimes be seen with seizures. Clinical correlation is needed" (R. 794, 815).

Plaintiff's May 29, 2010, polysomnography showed her Epworth sleepiness scale was nineteen (19) and "demonstrate[d] a normal sleep latency and efficiency." Plaintiff's snoring was mild and intermittent; she had severe periodic limb movement disorder ("PLMD"). Dr. Porterfield found Plaintiff's snoring did not require treatment; however, if treatment was desired, she could consider weight loss; she could treat PLMD with pramipexole, Neurontin, carbamazepine, Klonopin, Ambien, or Lunesta. (R. 795-99).

Administrative Hearing

At the administrative hearing held on May 18, 2010, Plaintiff testified she was thirty-seven (37) years old, weighed two-hundred-eight (208) pounds and was five (5) feet, six (6) inches tall (R. 57). Plaintiff had two (2) sons, aged four (4) and one (1). She lived with her boyfriend, who received Social Security disability benefits for impairments caused by a work-related injury (R. 57-58). She could drive for thirty (30) minutes before having to stop for a break; she drove to the administrative hearing (R. 59).

---

[5]Paroxysmal: recurring in paroxysms. *Dorland's Illustrated Medical Dictionary*, 32nd Ed., 2012, at 1384.
        Paroxysm: a sudden recurrence or intensification of symptoms. *Dorland's Illustrated Medical Dictionary*, 32nd Ed., 2012, at 1384.

Upon examination by Plaintiff's counsel, Plaintiff stated she experienced stress headaches twice a month, which lasted from one (1) to four (4) days and were eight (8) on a scale of one (1) to ten (10). Plaintiff stated her neck pain was in the middle of her neck and radiated to her head and shoulders. She could move her neck up and down and from side to side with pain (R. 69-71). Her neck pain was relieved when she lowered her head to her chest (R. 72). Her neck "tightness" was present "most of the time." Plaintiff stated her arms went numb from her wrists to her forearms; "usage" exacerbated the numbness (R. 74). She could reach above her head with pain in her neck and back but no pain in her shoulder (R. 75). Moving her arms back and forth, in front of her body, would cause them to "go to sleep and go weak" after five (5) or ten (10) minutes. Plaintiff stated she could grasp. She could peel four (4) or five (5) potatoes before her wrists and arms hurt and her hands went numb (R. 76). She cut her fingers because they went numb. Plaintiff stated she could pick up objects, like letters, but she did not "feel the whole" object with her fingertips (R. 77). Plaintiff stated she would not have difficulty writing a letter "for ten minutes or so." She could write two (2) letters but it would take longer than twenty (20) minutes. She stated she "might be okay" if she attempted to write three (3) letters (R. 78). She would not be able to write for a whole work day (R. 79).

Plaintiff described her mid back pain as constant; she said it was a level eight (8). Plaintiff testified that "lots of movement and walking, sitting too long, standing too long" made her back pain worse (R. 78-9). Plaintiff stated she could sit for one (1) hour before she needed to stand. Plaintiff stated she sat in a padded rocking chair most of the time (R. 80). She sat comfortably in that chair. Plaintiff testified she could stand for no more than ten (10) or fifteen (15) minutes due to back pain (R. 81). She could walk to the mail box and back and she was "up and down" on her feet throughout

the day. She avoided lifting because it caused pain in her back and neck; she could lift a bag of sugar (R. 82). Plaintiff testified she tried to avoid lifting her children "at all costs." Plaintiff stated she encouraged her youngest to crawl to where she needed him to be (R. 83).

Plaintiff stated she took medication to help her sleep, which aided in falling asleep but not staying asleep. She was "up and down all night" and slept between four (4) and five (5) hours a night (R. 84). She had no energy. She napped when her sons napped, if she was "lucky." She stated she washed dishes, did laundry, cooked and did some housework, but it took her "quite a bit longer than it normally would" because she took breaks to sit (R. 85). Plaintiff testified she could work for fifteen (15), twenty (20) or thirty (30) minutes before she needed to take a break, and, once she took a break, she did not finish the chore "nine times out of ten," except for washing dishes (R. 86).

Plaintiff stated she medicated with Percocet; she doubled the dose, but took the prescribed number of pills daily; and the medication eased her pain within thirty (30) minutes to an hour of taking it (R. 87). Plaintiff testified Percocet "seem[ed] to last longer when [she took] two." Plaintiff stated Percocet had "been working" but she was "still hurting." She felt aggravated, "tension, nerves." Plaintiff stated she felt useless because she could "not do much." She could not care for her sons "like [she] would" like to do because she was not able to "help take care of the family much." She would "love to go out and run with [her] boys," but she could not do that (R. 88).

Plaintiff's counsel asked if medication controlled her symptoms; Plaintiff stated it did not. Counsel stated that "most of the time when they ask you about that, and you say, yeah, you're doing better. The medicine's helping you out." Plaintiff stated the medication "work[ed] most of the time" and she "put on a front" because she was tired of taking pills. Plaintiff stated she had periods of being tearful and became angry easily (R. 89-91). Plaintiff stated she had "good stamina with" her

children.  Plaintiff stated not having caffeine caused headaches (R. 91).  Plaintiff testified she had been treated at a pain clinic one time and had undergone physical therapy (R. 92).

Plaintiff stated she had not gotten splints for her arms, as prescribed;  she gave the prescription to the physical therapist, but the therapist had not "gotten to it" because he was "so busy" (R.94).  Plaintiff stated that physical therapy, in the past, had been helpful to her "somewhat." Plaintiff stated she had not returned to physical therapy because she had been pregnant and then her appointment schedule conflicted with the schedule of the physical therapist (R. 95-96).

Plaintiff stated she and her boyfriend did housework together as "best [they] can." Her boyfriend helped care for the children, but not as much as she would "like." She ran her own errands, went to the grocery store, cooked, did laundry, vacuumed, and swept "as [she could] do" (R. 98-99).

Plaintiff testified that FNP Meadows primarily cared for her back condition (R. 100). Plaintiff stated that Dr. Miele, a neurologist, had evaluated her back and would not perform "such delicate" surgery "unless [she] went paralyzed."  Plaintiff stated Dr. Miele did not document this opinion.  Plaintiff did no home exercises for her back (R. 101).  Plaintiff did not use a brace or a TENS unit.  Plaintiff testified that a doctor in Elkins told her that he could prescribe a TENS unit for her, but "nobody ever made [her] another appointment with him" (R. 102).

The VE asked the ALJ the following hypothetical question:

> If you would, please, assume a hypothetical individual the same age, education, and work experience as the Claimant, who is able to perform light work with the following limitations, can perform all postural movements occasionally, except cannot climb ladders, ropes, or scaffolds. Must avoid exposure to temperature extremes, to excessive vibration, and to hazards such as dangerous moving machinery or any unprotected heights. Is limited to work involving only routine and repetitive instructions and tasks, and requiring no intense concentration, is limited to low stress jobs free of production rate or pace work, with few, if any, workplace changes and little independent decision making.  Now could such an individual perform . . . jobs in the regional or national economy . . . . (R. 105-06).

The VE responded that work of a storage facility rental clerk, a marker, and mail clerk would be available in the local and national economies (R. 106).

The VE then asked the ALJ to include the following limitations:

> . . . Individual must be permitted to change positions briefly, that is for one to two minutes between sitting and standing or walking, every 30 minutes throughout the workday. The individual is limited to occupations that require no repetitive pushing or pulling with the upper extremities, and no overhead work. The individual is unable to balance or crawl. Individual is limited to occupations that require no repetitive rotation of the neck. Sir, are there jobs in the regional or national economy such an individual could perform? (R. 106-07).

The VE responded that work as an information clerk, officer helper, and mail clerk would be available in the local and national economies. When the ALJ reduced the hypothetical to sedentary, the VE found there were still jobs in the local and national economies available (R. 107).

On June 22, 2010, the ALJ entered a decision finding Plaintiff was not disabled through the date of the decision (R. 22-33).

### III.  Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, the ALJ Woody made the following findings:

1.     The claimant meets the insured status requirements of the Social Security Act through March 31, 2012.

2.     The claimant has not engaged in substantial gainful activity since July 16, 2007, the alleged onset date. (20 CFR 404.1571 *et seq.* and 416.971 *et seq.*).

3.     The claimant has the following severe impairments: multilevel degenerative disc disease of the cervical, thoracic, and lumbar spine; obesity; major depressive disorder; anxiety disorder NOS; and pain disorder with both physical and psychological components. (20 CFR 404.1520(c) and 416.920(c)) (R. 24).

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part

404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926) (R. 26).

5.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with the following limitations: must be permitted to change positions briefly between sitting and standing/walking every 30 minutes throughout the day; no repetitive pushing or pulling with the upper extremities; no overhead work; no repetitive rotation of the neck; can perform all postural movements occasionally, except cannot balance, crawl, or climb ladders, ropes or scaffolds; must avoid exposure to temperature extremes, excessive vibrations and hazards such as unprotected heights and dangerous moving machinery; is limited to only routine and repetitive instructions and tasks, requiring no intense concentration; is limited to low stress jobs, involving no production rate or pace work, few if any work place changes, and little independent decision making; and no more than occasional interaction with co-workers and supervisors or work in coordination with others, and limited interaction with the public (R. 27).

6.     The claimant is unable to perform any past relevant work. (20 CFR 404.1565 and 416.965).

7.     The claimant was born on March 16, 1973, and was 34 years old on the alleged disability onset date, which is defined as a younger individual age 18-49. (20 CFR 404.1563 and 416.963).

8.     The claimant has at least a high school education and is able to communicate in English. (20 CFR 404.1564 and 416.964).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills. (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform. (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a) (R. 32).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from July 16, 2007, through the date of this decision. (20 CFR 404.1520(G) and 416.920(g) (R. 33).

## IV. Discussion

### A. Scope of Review

In reviewing an administrative finding of no disability, the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

### B. Contentions of the Parties

The Plaintiff contends:

1.      The ALJ failed to consider several diagnosed impairments as severe (Plaintiff's brief at p. 6).

2.      The ALJ gave no consideration to the pertinent listings, the criteria of the listings and how the impairments might combine to meet or medically equal relative listings. The complexity of the claimant's numerous impairments required the services of a medical expert (Plaintiff's brief at p. 8).

3.      The ALJ did not follow the mandates of SSR 96-7p when determining the issue of credibility of claimant's subjective complaints and concomitantly by

failing to follow the guidelines and requisites of SSR 96-7p when considering and weighing the opinion of the primary care physician and her supervising physician (Plaintiff's brief at p. 11).

4.  The jobs identified by the ALJ were not in response to a complete and adequate hypothetical question which incorporated all of claimant's exertional and nonexertional limitations (Plaintiff's brief at p. 13).

The Commissioner contends:

1.  Substantial evidence supports the ALJ's evaluation of Plaintiff's severe impairments (Defendant's brief at p. 9).

2.  Substantial evidence supports the ALJ's conclusion that Plaintiff's impairments do not meet or medically equal any of the listing of impairments (Defendant's brief at p. 11).

3.  Substantial evidence supports the ALJ's credibility assessment and evaluation of the opinion of Plaintiff's medical provider (Defendant's brief at p. 12).

4.  Substantial evidence supports the hypothetical question posed to the vocational expert (Defendant's brief at p. 14).

## C. Severe Impairments

Plaintiff first argues that the ALJ failed to consider several diagnosed impairments as severe. "[A]n impairment can be considered as "not severe" only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience.' " Evans v. Heckler, 734 F.2d 1012 (4th Cir. 1984)(citing Brady v. Heckler, 724 F.2d 914 (11th Cir. 1984))(emphasis in original). Here the ALJ found Plaintiff had the following severe impairments: multilevel degenerative disc disease of the cervical, thoracic, and lumbar spine; obesity; major depressive disorder; anxiety disorder NOS; and pain disorder with both physical and psychological components. He found Plaintiff's carpal tunnel syndrome and symptoms "suggestive of" MS or a seizure disorder not severe. Plaintiff also argues the ALJ failed to consider her degenerative changes in the left shoulder

and her "foot pain and the deformities established by x-ray."

The undersigned first finds evidence of "foot pain and deformities established by x-ray" and "degenerative changes in the left shoulder" were not impairments in front of the ALJ, according to the record, and Plaintiff's own Memorandum. The undersigned agrees with the ALJ that, although providers considered some of Plaintiff's symptoms "suggestive of" MS or a seizure disorder, Plaintiff was not diagnosed with such. Plaintiff's November 18, 2007, MRI of her brain showed "nonspecific white matter lesions." It was noted that the "possibility of very early MS is a consideration" She was subsequently examined by Dr. Navada, who expressly stated: "[t]he possibility of multiple sclerosis has been raised in this young woman. Her symptoms[,] however[,] are not supportive of the same. She has not had symptoms such as optic neuritis, vertigo or bladder symptoms"; and "cranial MRI images were not very impressive." Dr. Navada recommended blood work to "look[] for treatable causes of memory impairment as well as fatigue," an overnight polysomnogram, and electroencephalogram ("EEG") (R. 385). The EEG was normal. In 2010, Dr. Fahim found she had only a "questionable history of multiple sclerosis."

Regarding an alleged seizure disorder, again the evidence does not support a severe impairment. In 2006, Plaintiff reported she had a history of migraine headaches and seizures "in the past." She subsequently reported to FNP Curry that she had had seizures "several years ago [and] she had not experienced a seizure for 'several years.'" In 2008, Plaintiff told a psychiatrist she had had grand mal seizures since 1997; she only had them when she slept; she was prescribed anti-seizure medication in 1997; and she never took the medication. Dr. Fahim in 2008 diagnosed her with "history of seizures." The undersigned finds substantial evidence supports the ALJ's determination that Plaintiff's possible MS and/or seizure disorder were non-severe.

The undersigned does find substantial evidence does not support the ALJ's determination that Plaintiff's carpal tunnel syndrome was not severe.

Plaintiff told psychologist Larry Legg in February, 2008, that her hands tingled "all the time." In July 2008, neurologist Dr. Navada conducted a motor nerve study, sensory nerve study, and EMG of Plaintiff on July 3, 2008, relative to her complaints of paresthesias and weakness of her arms (R. 541-42). He found the study was abnormal and "supportive of carpal tunnel syndrome bilaterally[.] The changes were moderate on the left and moderate to moderately severe on the right side." In August 2008, neurologist Dr. Miele, completed a consultative examination of Plaintiff. Her chief complaints were right arm numbness and thoracic and low back pain. Plaintiff stated her right hand became intermittently numb "throughout the day." Although she stated it did not awaken her from sleep and she did not drop objects, she felt it "tire[d] easily." Dr. Miele considered the July EMG, which he found supported a diagnosis of bilateral carpal tunnel syndrome. Plaintiff also had a positive Phalen's test of the right hand.[6] He did opine that conservative treatment would be "appropriate," prescribed palmar wrist splints and instructed Plaintiff to wear as needed, and ordered physical therapy. Plaintiff testified the only reason she did not use the wrist splints was she never received them.

Plaintiff's primary care provider, FNP Meadows, opined that Plaintiff could not use her hands for repetitive motions due to carpal tunnel syndrome. She also found, based upon medical signs, that Plaintiff's right hand had loss of grip strength and numbness.

Plaintiff testified at the hearing that she could grasp. She could peel four (4) or five (5)

---

[6]A positive Phalen's test results in numbness, tingling or paresthesias and indicates carpal tunnel syndrome. Dorland's Illustrated Medical Dictionary, 1896 (32nd edition 2012).

potatoes before her wrists and arms hurt and her hands went numb. She cut her fingers because they went numb. Plaintiff stated she could pick up objects, like letters, but she did not "feel the whole" object with her fingertips. Plaintiff stated she would not have difficulty writing a letter "for ten minutes or so." She could write two (2) letters but it would take longer than twenty (20) minutes. She stated she "might be okay" if she attempted to write three (3) letters (R. 78). She would not be able to write for a whole work day.

Even if Plaintiff's carpal tunnel syndrome is not considered a "severe" impairment, it is a medically-determinable impairment that must be considered in combination with all her other impairments in determining her residual functional capacity. 20 C.F.R. 404.1520(e), 404.1545, 416.920(e), and 416.945; Social Security Ruling ("SSR") 96-8p. Here the ALJ simply stated Plaintiff's carpal tunnel syndrome, in combination with all her other impairments, is "accommodated by the reduction to light work."

"[A]n impairment can be considered as "not severe" only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience.' " Evans v. Heckler, 734 F.2d 1012 (4th Cir. 1984). The undersigned finds substantial evidence does not support the ALJ's conclusion that Plaintiff's carpal tunnel syndrome is not severe– in other words that it would not be expected to interfere with her ability to work--, substantial evidence also does not support the ALJ's assertion that he accommodated the carpal tunnel syndrome by the reduction to light work.

### D. Listings and Medical Expert

Plaintiff next argues: "The ALJ gave no consideration to the pertinent listings, the criteria of the listings and how the impairments might combine to meet or medically equal relative listings.

46

The complexity of the claimant's numerous impairments required the services of a medical expert." The undersigned first takes up Plaintiff's argument regarding the necessity of a medical expert. This argument is based in particular on Plaintiff's symptoms of MS. In this regard, Plaintiff argues "[t]he diagnosis of MS has been considered since 2007 and cannot simply be ignored. The more prudent course requires the services of an ME as opposed to the ALJ rendering an opinion which exceeds the realm of his expertise." The undersigned disagrees. SSR 96.6p provides that the ALJ is responsible for deciding the ultimate legal question whether a listing is met or equaled. Although "longstanding policy requires that the judgment of a physician designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge must be received into the record as expert opinion evidence and given appropriate weight," a number of documents on which State agency medical consultants may record their findings satisfy the requirement to receive expert opinion evidence into the record. Here, none of the various forms submitted by State agency medical consultants indicate that Plaintiff met or equaled any Listing. The ALJ therefore did not err in failing or refusing to retain a medical expert regarding Plaintiff's questionable MS.

At step three of the sequential evaluation process, the ALJ must determine whether the claimant's impairment or combination or impairments meets or medically equals the criteria of an impairment listed in 20 CFR part 404, Subpart P, Appendix 1(20 CFR 404.1520(d), 404.1525, 404.1526. 416.920(d), 416.925, and 416.926). If the claimant's impairment or combination of impairments meets or medically equals the criteria of a listing and meets the duration requirement (20 CFR 404.1509 and 416.909) the claimant is disabled. If it does not, the analysis proceeds to the next step.

In <u>Cook v. Heckler</u>, 783 F.2d 1168 (4th Cir. 1986), the ALJ found that the claimant did not

meet Listing 1.01. The Fourth Circuit noted that listing consisted of four subsidiary lists of impairments, and that the ALJ did not compare the claimant's symptoms to any of the four subsidiary lists of impairments. The Fourth Circuit then held:

> The ALJ should have identified the relevant listed impairments. He should then have compared each of the listed criteria to the evidence of Cook's symptoms. Without such an explanation, it is simply impossible to tell whether there was substantial evidence to support the determination.

In this case the ALJ found Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments. He then, however, identified and discussed only Plaintiff's mental impairments, pursuant to 12.04 and 12.06, while Plaintiff asserts that the "obvious" "relevant listed impairments" in this case are 11.09 and 1.04A.[7]

> Listing 11.09 for Multiple sclerosis, requires:
>
> A. Disorganization of motor function as described in 11.04B; or
>
> B. Visual or mental impairment as described under the criteria in 2.02, 2.03, 2.04, or 12.02; or
>
> C. Significant, reproducible fatigue of motor function with substantial muscle weakness on repetitive activity, demonstrated on physical examination, resulting from neurological dysfunction in areas of the central nervous system known to be pathologically involved by the multiple sclerosis process.

Plaintiff does not argue, and the undersigned finds the evidence does not support either A or B.

Plaintiff does argue the evidence may support C. Importantly, however:

_____

[7]The undersigned notes that the Commissioner recently objected to a Report and Recommendation remanding a case to the ALJ based on the holding in Cook, arguing that Cook was distinguishable in part because it involved the denial of widows' benefits, which established a stricter standard for disability. The undersigned has not found that the Fourth Circuit distinguished cases on that basis, and itself recently decided Jackson v. Astrue, 467 Fed. Appx. 214 (4th Cir. 2012)(unpublished) making the same findings, that the ALJ is required to identify the relevant listed impairments and compare the listing criteria with the evidence of the plaintiff's symptoms.

> Use of the criteria in 11.09C is dependent upon (1) documenting a diagnosis of multiple sclerosis, (2) obtaining a description of fatigue considered to be characteristic of multiple sclerosis, and (3) obtaining evidence that the system has actually become fatigued. The evaluation of the magnitude of the impairment must consider the degree of exercise and the severity of the resulting muscle weakness.

Here there has never been a documented diagnosis of multiple sclerosis. As already noted, Plaintiff's November 18, 2007, MRI of her brain showed "nonspecific white matter lesions" and it was noted that the "possibility of very early MS [was] a consideration." Upon subsequent examination by Dr. Navada, however, he expressly stated: "[t]he possibility of multiple sclerosis has been raised in this young woman. Her symptoms[,] however[,] are not supportive of the same. She has not had symptoms such as optic neuritis, vertigo or bladder symptoms"; and "cranial MRI images were not very impressive." In 2010, three years later, Dr. Fahim found only that Plaintiff had a "questionable history of multiple sclerosis."

In Cook, the court found "ample evidence" in the record to support a determination that the claimant's impairment met or equaled a listed impairment. The undersigned does not find ample evidence that Plaintiff meets or equals listing 11.09C. Substantial evidence therefore supports the ALJ's non-consideration of Listing 11.09C.

The result is not the same as to Listing 1.04A, however, which requires:

> 1.04 *Disorders of the spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

In this case it is undisputed that Plaintiff has disc herniations at both the cervical and thoracic levels.

Cervical MRI showed a herniated disk in the left neural foraminal zone at C4-C5, which caused severe neural foraminal narrowing at the exiting left C5 nerve root. Thoracic MRI showed multilevel disc herniations on the right from T6 through T9 with encroachment on the anterior spinal cord. Lumbar spine MRI showed signal loss within the L3-4 disc with mild disc space narrowing with osteophytic change; diffuse annular bulging at the same level with bilateral foraminal encroachment; facet joint hypertrophy in the lower lumbar spine particularly at L4-5 and L5-S1; and diffuse annular bulging and facet joint hypertrophy which encroach[ed] upon the right foramen more than the left at L5-S1. Dr. Miele found Plaintiff had "significant degenerative disc disease for a person so young." Plaintiff also complained of weakness, numbness, and pain.

Unlike the Fourth Circuit in Cook, the undersigned is unable to assert that "there is ample evidence in the record to support a determination that [Plaintiff's degenerative disc disease and other spinal impairments] met or equaled [Listing 1.04A]. Cook, 783 F.2d at 1172. The undersigned does find, however, that 1.04A is a relevant listing. Yet the ALJ did not identify Listing 1.04A in the decision. Under Cook the ALJ must not only identify the relevant listing but also compare the claimant's symptoms to the listing's criteria. Id. at 1173. That did not occur in this case.[8]

The undersigned therefore finds that substantial evidence does not support the ALJ's determination that none of Plaintiff's impairments, alone or in combination, met or equaled a listing.

### E.  96-7p and 96-6p

Plaintiff next argues the ALJ did not follow the mandates of SSR 96-7p when determining

---

[8]The undersigned must admit some concern regarding Plaintiff's counsel's express assertion several times, including during the Administrative Hearing, that Plaintiff did not meet any listing. Although the undersigned finds this assertion did not relieve the ALJ of his duty to consider all the evidence, it could have misled him into believing Plaintiff was not asserting she met or equaled any listing.

the issue of credibility of her subjective complaints and concomitantly by failing to follow the guidelines and requisites of SSR 96-6p when considering and weighing the opinion of the primary care physician and her supervising physician.

## 1. Credibility

The Fourth Circuit has developed a two-step process for determination of whether a person is disabled by pain or other symptoms as announced in <u>Craig v. Chater</u>, 76 F. 3d 585 (4th Cir. 1996):

> 1) For pain to be found to be disabling, there must be shown a medically determinable impairment which could reasonably be expected to cause not just pain, or some pain, or pain of some kind or severity, but *the pain the claimant alleges she suffers*. The regulation thus requires at the threshold a showing by objective evidence of the existence of a medical impairment "which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Cf. Jenkins*, 906 F.2d at 108 (explaining that 42 U.S.C. § 423(d)(5)(A) requires "objective medical evidence of some condition that could reasonably be expected to produce the pain alleged"). *Foster*, 780 F.2d at 1129 . . . .

> 2) It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, *that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated*, *See* 20 C.F.R. §§ 416.929(c)(1) & 404.1529(c)(1). Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings, *see id.;* any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.). *See* 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it. *See* 20 C.F.R. § 416.929(c)(3) & 404.1529(c)(3). (Emphasis added).

<u>Craig</u>, <u>supra</u> at 594. The ALJ found Plaintiff met the first, threshold, step as announced in <u>Craig</u>, in that he found her medically determinable impairments could reasonably be expected to cause her alleged symptoms. Having done so, he was next required to evaluate Plaintiff's symptoms and the extent to which they affect her ability to work, taking into account "all the available evidence."

The undersigned finds the ALJ failed to take into account all the available evidence. First, the undersigned already found substantial evidence did not support the ALJ's determination that Plaintiff's carpal tunnel syndrome was severe and would affect her ability to work. Second, the undersigned already found substantial evidence did not support the ALJ's determination that Plaintiff did not meet any listing, in particular 1.04A. Third, although the ALJ specifically found Plaintiff had a severe pain disorder with both physical and psychological components, he did not address the results that mental disorder may have on her credibility regarding pain and functional limitations.

Diagnostic and Statistical Manual of Mental Disorders, 458 ("DSM-IV") (4th ed.1994) provides as follows:

> The essential feature of Pain Disorder is pain that is the predominant focus of the clinical presentation and is of sufficient severity to warrant clinical attention. The pain causes significant distress or impairment in social, occupation, or other important areas of functioning. Psychological factors are judged to play a significant role in the onset, severity, exacerbation, or maintenance of the pain. The pain is not intentionally produced or feigned as in Factitious Disorder or Malingering. Pain Disorder is not diagnosed if the pain is better accounted for by a Mood, Anxiety, or Psychotic Disorder. Examples of impairment resulting from the pain include inability to work or attend school, frequent use of the health care system, the pain becoming a major focus of the individual's life, substantial use of medications, and relational problems such as marital discord and disruption of the family's normal lifestyle.

In particular Pain Disorder Associated with Both Psychological Factors and a General Medical Condition is used when both psychological factors and a general medical condition are judged to have important roles in the onset, severity, exacerbation, or maintenance of the pain. Id.

Pain Disorder is listed under 12.07 for Somatoform Disorders in the Listings, and is described as follows:

> Physical symptoms for which there are no demonstrable organic findings or known physiological mechanisms.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied.

A. Medically documented by evidence of one of the following:

    1. A history of multiple physical symptoms of several years duration, beginning before age 30, that have caused the individual to take medicine frequently, see a physician often and alter life patterns significantly; or

    2. Persistent non-organic disturbance of one of the following
        a. Vision; or
        b. Speech; or
        c. Hearing; or
        d. Use of a limb; or
        e. Movement and its control (e.g., coordination disturbance, psychogenic seizures, akinesia, dyskinesia; or
        f. Sensation (e.g., diminished or heightened).

    3. Unrealistic interpretation of physical signs or sensations associated with the preoccupation or belief that one has a serious disease or injury; AND

B. Resulting in at least two of the following:

    1. Marked restriction of activities of daily living; or
    2. Marked difficulties in maintaining social functioning; or
    3. Marked difficulties in maintaining concentration, persistence, or pace; or
    4. Repeated episodes of decompensation, each of extended duration.

The psychologist who diagnosed Pain Disorder found Plaintiff had Moderate restrictions and no episodes of decompensation, and therefore did not find Plaintiff met the "B" criteria of the Listing. The ALJ, however, did find "Pain Disorder" to be a severe impairment. Pain Disorder can cause a "persistent non-organic disturbance" of "movement and its control" and "sensation," two symptoms Plaintiff claimed.

Based on all of the above, the undersigned finds substantial evidence does not support the

ALJ's credibility finding.

## 2. Treating Provider Opinion

Plaintiff also argues that the ALJ failed to follow SSR 96-6p when considering and weighing the opinion of the primary care physician and her supervising physician. Plaintiff refers to Family Nurse Practitioner Meadows. It is undisputed that FNP Meadows was Plaintiff's primary care provider. It is also undisputed that she is a Nurse Practitioner. SSR 06-03p provides that a Nurse Practitioner, while a "medical source," is not an "acceptable medical source." The Ruling further provides:

> The distinction between "acceptable medical sources" and other health care providers who are not "acceptable medical sources" is necessary for three reasons. First, we need evidence from "acceptable medical sources" to establish the existence of a medically determinable impairment . . . . Second, only "acceptable medical sources" can give us medical opinions. . . . Third, only "acceptable medical sources" can be considered treating sources . . . , whose medical opinions may be entitled to controlling weight.

The undersigned finds the ALJ did not err by referring to Ms. Meadows as "not an acceptable medical source." Although the questionnaire was countersigned by a physician, it is clear it was completed by FNP Meadows, and it is clear from the record that she was the provider treating Plaintiff. She cannot be, however, a "treating source" whose opinion may be entitled to controlling weight. She cannot provide "medical opinions." SSR 96-6p, cited by Plaintiff, simply does not therefore apply to FNP Meadows. SSR 06-03p, does provide, however, that the ALJ can use evidence from "other sources" such as FNP Meadows, "to show the severity of the individual's impairment(s) and how it affects the individual's ability to function." SSR 06-03p concedes the growth of managed health care and the emphasis on containing medical costs, and concedes medical sources such as nurse practitioners have increasingly assumed a greater percentage of the treatment

and evaluation functions previously handled primarily by physicians and psychologists. "Opinions from these medical sources, who are not technically deemed 'acceptable medical sources' under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." Id.

The ALJ here did evaluate FNP Meadows' opinion. His reasons for according her opinions little weight were not because of her status as a nurse practitioner, but "because they are internally inconsistent and inconsistent with the evidence of record, including Ms. Meadows' own treatment notes." As an example, the ALJ cited FNP Meadows' opinion that Plaintiff was capable of working an 8-hour work day at the sedentary level, where she would sit most of the day, walk and stand occasionally, and lift no more than 10 pounds. While there was a space provided to indicate that the claimant could not sustain any activity level on a full time basis, Ms. Meadows did not indicate so. She then indicated Plaintiff would need a sit/stand option at intervals of one hour. In the next section of questions, however, FNP Meadows indicated that Plaintiff could stand or walk a total of only one hour per day and sit for a total of only four hour per day. She further indicated Plaintiff would not need to lie down, recline, or put her feet up during the workday.

Contrary to Plaintiff's argument, the undersigned agrees with the ALJ that Ms. Meadows' opinions were inconsistent internally and inconsistent with other evidence. The questionnaire asked (and Ms. Meadows responded):

11.     In view of patient's known medical impairments, which level of activity **for an 8 hour day** would you recommend? (Emphasis added).

**Heavy**: Walking and standing most of the time lifting 50 pounds frequently and up to 100 pounds occasionally     Yes___     No __X__

**Medium:**  Walking and standing most of the time lifting 25 pounds frequently and up to 50 pounds occasionally     Yes_____   No__X__

**Light**: A significant amount of walking and standing, lifting 10 pounds frequently and up to 20 pounds occasionally, or sitting most of the time pushing and pulling    Yes _____   No __X__

**Sedentary**: Sitting most of the time, walking and standing occasionally, lifting no more than 10 pounds    Yes __X__   No _____

If activity level cannot be sustained, please specify any on a part-time basis:

_____

_____

Later, however, where asked how many maximum hours in an 8-hour period would the patient be able to be up on her feet (alternating walking and standing) FNP Meadows responded 1 hour. Where asked how many maximum hours in an 8-hour period the patient would be able to sit upright in a regular chair, Ms. Meadows responded 4 hours.  The total number of hours Plaintiff could stand, walk or sit within an 8-hour period would therefore only total 5 hours.  Yet FNP  Meadows did not opine it was necessary or even advisable for Plaintiff to recline or lie down or put her feet up during the day.  The ALJ reasonably questioned what claimant would be doing the remainder of the 8-hour day.  The ALJ also found unsupported  Ms. Meadows' restriction on Plaintiff's sitting upright for long period of time with her head flexed forward, which she based  on her history of carpal tunnel syndrome.

The undersigned finds substantial evidence supports the ALJ's according little weight to the questionnaire completed by Ms. Meadows.

## F. Hypothetical Question

Plaintiff lastly argues that the jobs identified by the ALJ were not in response to a complete and adequate hypothetical question which incorporated all of claimant's exertional and nonexertional limitations. Having already found the ALJ erred at the second and third steps, and his credibility assessment, (in particular regarding Plaintiff's severe pain disorder), it follows that the hypothetical question posed to the VE may not have contained all of Plaintiff's exertional and nonexertional limitations supported by the record. Walker v. Bowen, 889 F.2d 47 (4th Cir. 1989). Substantial evidence therefore does not support the ALJ's reliance on the response to the hypothetical by the VE.

## G. Re-Opening

In her Brief, Plaintiff states counsel requested at the hearing that her prior claims be reopened. Plaintiff filed a prior claim in 2007, alleging the same onset date as the current claim. At the Administrative Hearing, counsel requested reopening of the prior claim, asserting it was within the period of reopening for any reasons, and that the additional evidence is new and material (R. 53). The ALJ did not mention reopening in his Decision, and there would have been no need to reopen based on his determination that Plaintiff was not disabled from July 16, 2007, through the date of his decision. On remand, if it is found that Plaintiff was disabled at any time through the date of the decision, the Commissioner shall take into consideration whether or not to re-open the prior claim.

## V. RECOMMENDATION

For the reasons herein stated, I find substantial evidence does not support the Commissioner's decision denying the Plaintiff's applications for DIB and for SSI. I accordingly recommend Defendant's Motion for Summary Judgment be **DENIED**, and Plaintiff's Motion for Summary Judgment be **GRANTED in part,** by **REMANDING** this action to the Commissioner

pursuant to sentence four of 42 U.S.C. section 405(g) for further action in accordance with this Report and Recommendation/Opinion.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984), <u>cert. denied</u>, 467 U.S. 1208 (1984); <u>Wright v. Collins</u>, 766 F.2d 841 (4th Cir. 1985); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _17_ day of December , 2012.


JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE